**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

STEVEN L. ZIRKO (M-06602),      )
                                       )
             **Plaintiff,**      )
                                       )     **Case No. 24 C 50330**
             **v.**              )
                                       )     **Hon. Rebecca R. Pallmeyer**
MONICA CARPENTER, et al.,      )
                                       )
             **Defendants.**     )

## MEMORANDUM ORDER

Plaintiff Steven Zirko, a prisoner in the custody of the Illinois Department of Corrections, has brought this action under 42 U.S.C. § 1983 against officials at Dixon Correctional Center. Plaintiff alleges that Defendants Dr. Sy and Health Care Unit Supervisor Monica Carpenter were deliberately indifferent to his serious medical need when they denied his request to be assigned to a single-man cell. Defendants have moved for summary judgment, arguing that the evidence does not support a finding of deliberate indifference on the part of either Defendant. For the reasons stated in this opinion the motions [66], [71] are denied. This case is set for a telephone status hearing on April 2, 2026 at 10:30 a.m. to discuss next steps in this case.

## LOCAL RULE COMPLIANCE

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this court. The Rule directs the moving party to submit the motion, supporting memorandum of law, and statement of material facts accompanied by cited evidentiary material. N.D. Ill. L.R. 56.1(a), (d). The opposing party then must submit a response to the moving party's motion and statement of facts, consisting of "numbered paragraphs corresponding to the numbered paragraphs in the [movant's] statement[.]" N.D. Ill. L.R. 56.1(b), (e)(1). "Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." N.D. Ill. L.R. 56.1(e)(2). The party opposing summary judgment may also submit a separate "statement of additional material facts," also consisting of "concise numbered

1

paragraphs," "supported by citation to the specific evidentiary material" supporting those statements.  N.D. Ill. L.R. 56.1(b)(3); 56.1(d)(1), (2).

Because Plaintiff is proceeding without counsel, Defendants served him with notice, explaining the procedures for opposing summary judgment [69, 76].  Plaintiff did not respond to each of Defendants' enumerated statements of fact (*see* Pl. Resp. in Opposition to Defendants' Motions for Summary Judgment [84]), and those statements, so long as they are supported by cited evidence, are deemed admitted.  *See* N.D. Ill. L.R. 56.1(e)(3).  Plaintiff did present "posited facts" in his 310-page submission ([84] at 25-26), but those facts are not individually enumerated and are not supported by citations to the record.  The court will not consider unsupported factual assertions or speculation.  *See Jones v. DeJoy*, No. 18 CV 1213, 2020 WL 6716218, at *1-2 (N.D. Ill. Nov. 16, 2020).  The court will, however, generously construe the facts identified by Plaintiff to the extent they are supported by the record, or he could properly testify to them.  *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently).  And the court recognizes that Plaintiff's failure to strictly comply with Local Rule 56.1 is not a basis for automatically granting Defendants' motions.  *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021).  The moving party bears the "ultimate burden of persuasion" that it is entitled to judgment as a matter of law.  *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

## **FACTS**

Plaintiff Steven Zirko ("Plaintiff") is an inmate in the custody of the Illinois Department of Corrections ("IDOC"), currently incarcerated at Dixon Correctional Center ("Dixon"). (Def. Carpenter's L.R. 56.1 SOF ("Carpenter SOF") [67] ¶ 1.)

Defendant Carpenter has been the Healthcare Unit Administrator ("HCUA") at Dixon since February 2022.  (*Id.* ¶ 2.)  Carpenter is a registered nurse, but her role as HCUA is strictly administrative, and she lacks authority to issue or deny medical permits.  Instead, she oversees the health care unit's daily operations, staff supervision, and ensures compliance with IDOC policies.  (*Id.* ¶ 3.)  In her HCUA role, Carpenter does not provide direct clinical care, conduct

medical assessments, diagnose conditions, or prescribe treatments, except in rare emergencies. (*Id.* ¶ 4.) She has never diagnosed any condition or prescribed treatment to Plaintiff. (*Id.*) Defendant Carpenter possesses no authority to independently order, deny, or override a specific medical accommodation like a single-cell permit based on her own clinical judgment. (*Id.* ¶ 7.)

Defendant Dr. Larry Sy has been employed by Wexford Health Sources, Inc. as a physician for the Dixon Correctional Center in Dixon, Illinois since August 9, 2021. (Def. Sy's L.R. 56.1 SOF ("SY SOF") [79] ¶ 2.) He became Medical Director on or about May 17, 2022. (*Id.*) As Medical Director at Dixon, Dr. Sy's job duties included providing medical care and treatment to inmates at the prison and participating in collegial reviews regarding requests for off-site medical care and treatment for inmates. (*Id.*) As Medical Director, Dr. Sy has the final authority to make medical necessity determinations for inmate housing at Dixon. (*Id.* ¶ 5.)

Inmates at Dixon on occasion receive care from an offsite provider. A plan of continuing care or other specific recommendations made by such a provider may not be medically necessary and may or may not be initiated by the provider or by the inmate himself, by way of a request for a recommendation from the provider. (*Id.* ¶ 3.) When he receives such recommendations from another medical provider, whether at Dixon or from another institution, Dr. Sy exercises his own clinical judgment and evaluates the inmate's medical needs independently. (*Id.* ¶ 4.) He may or may not agree with the recommendations provided for an inmate by an offsite provider. (*Id.*) Dr. Sy, as the Medical Director, has the final medical authority for single-cell decisions. (*Id.* ¶ 6.)

In 2016, while he was incarcerated at Stateville Correctional Center, Plaintiff sustained a retinal detachment in his right eye. Dr. Joseph Civantos performed surgery at St. Joseph Hospital in Joliet and installed a permanent scleral buckle.[1] (Carpenter SOF ¶ 8; Pl.'s Dep. [67-1] 19:8–

---

[1] A scleral buckle is a surgical procedure to treat a detached retina in which the surgeon fits a piece of silicone or sponge on to the sclera, thus pushing the retina back into tissues that normally support it. *Scleral Buckle*, Cleveland Clinic, https://my.clevelandclinic.org/ health/treatments/25063-scleral-buckle (last visited March 8, 2026).

21; Medical Rs. [67-6] at 15–17.)[2]  Several doctors have warned Plaintiff that if he were punched in the eye, he could lose his vision.  (Carpenter SOF ¶ 9.)  In addition to this condition, Plaintiff suffers from severe migraines, which began in or around 2019.  (*Id.*)  Plaintiff experiences light sensitivity when his migraines occur, and lights turned on by other inmates exacerbate his pain. (*Id.*)

By 2021, Plaintiff had been transferred to Pontiac Correctional Center ("Pontiac"), where he was originally housed with a cellmate.  (Sy SOF ¶ 10.)  In response to a plumbing problem in March 2022, Plaintiff was moved, along with 300 other inmates, to a section of Pontiac called "north house."  (Carpenter SOF ¶ 11.)  All Pontiac inmates who had been transferred from "the farm" to "north house" in March 2022, including Plaintiff, were in single-man cells while at north house.  (Sy SOF ¶ 12.)  Whether Plaintiff had a single-man cell assignment at any time between his 2016 surgery and his 2022 move to north house is not clear from the record.

On May 8, 2023, while housed at Pontiac, Plaintiff was issued a single-man cell permit by Dr. Rodney Alford, the Medical Director at Pontiac.[3]  (*Id.* ¶ 16; Pl. Dep. [67-1] at 27:13–24.)  Dr. Alford did not mention migraines as the basis for the single-cell accommodation; instead, the medical record states that Dr. Alford's issuance of the single cell permit was "to reduce chance of further eye trauma."  (Sy Ex. 3 [79-2] at 22; [67-6] at 2; Carpenter SOF ¶ 13.)  Dr. Alford's notes do not explicitly refer to Plaintiff's 2016 eye surgery, nor do they provide any additional context explaining why (or whether) the risk of eye trauma to Plaintiff had increased in the seven years since his surgery.

Also while at Pontiac, Plaintiff's migraines had progressively worsened, which prompted a referral to Dr. Felix Chau at the Retina Clinic at the University of Illinois at Chicago on May 8,

---

[2]     In Defendant Carpenter's statement of material facts, paragraph 8 is misnumbered as paragraph 7.  The court has adjusted the numbering for this and the remaining pertinent statements of fact to match what should have been the correct nomenclature.

[3]     Plaintiff's deposition transcript indicates that Dr. Alford was the Medical Director at Pontiac during the relevant time period. (Pl. Dep. [67-1] at 27:13-24.)

2023—the same day Dr. Alford issued Plaintiff a single-man cell permit. (Sy SOF ¶¶ 13, 14.) At the conclusion of Plaintiff's appointment that day, Dr. Chau referred Plaintiff to a neurologist and asked Plaintiff if there was anything else he could for him. (Pl. Dep. [67-1] at 30:7–13.) In response, Plaintiff asked Dr. Chau to write a recommendation for a permit for Plaintiff's placement in a single-man cell. (*Id.* at 30:13–23; *see also* Sy SOF ¶ 15.) Dr. Chau initially did not understand why Plaintiff, who was already housed in a single-man cell, required the recommendation; Plaintiff advised he was making this request preemptively, as he believed prison officials would take away his single cell housing without it. (Sy SOF ¶ 15.) As Plaintiff acknowledged in his deposition, "most inmates do not want to be double celled." (*Id.* (citing Pl. Dep. at 32:8-9).) Dr. Chau's recommendation, like Dr. Alford's, was based on avoiding the "risk of eye trauma," rather than migraines. (Sy Ex. 2 [79-2] at 13; *see also* Sy SOF ¶ 14; Pl. Dep. [67-1] at 28:11–17.)

Plaintiff transferred from Pontiac Correctional Center to Dixon one month later, on June 6, 2023. (Carpenter SOF [67] ¶ 15.)[4] Under standard IDOC policy, medical permits from one facility do not automatically transfer when a prisoner is moved. Instead, permits must be re-evaluated by a Dixon medical provider to determine medical necessity at Dixon. (*Id.* ¶ 16.) On June 6, 2023, Plaintiff showed his Pontiac permit to Defendant Carpenter, who immediately told him there were no single-man cell permits at Dixon, and advised him to submit a grievance to register his concerns. (*Id.* ¶ 18.) Carpenter's standard practice, when approached by an individual in custody with a permit from another facility, is to explain the need for re-evaluation by a Dixon medical provider. (*Id.* ¶ 20.)

Individuals in custody are ordinarily housed with another cellmate in IDOC facilities, including at Dixon, and in general are not permanently placed in single-man cells for social

---

[4] Although Defendant Carpenter's statement of fact states Plaintiff was transferred from Menard Correctional Center, Plaintiff testified that he was transferred from Pontiac to Dixon on June 6, 2023. (Pl. Dep. [67-1] at 11:16-22.) Because there is no other information contained in the record regarding any events at Menard, the court assumes the reference to Menard was in error.

reasons or for mere convenience. (Sy SOF ¶ 6.) In limited circumstances, an inmate may be housed by himself in the Dixon health care unit or the Dixon infirmary, as opposed to a general population housing unit. (*Id.*) Those circumstances may include situations where the patient is infectious and needs to be placed in contact isolation, when the patient is recovering from surgery, or when the patient has a terminal illness. (*Id.*) The prison administration may make additional exceptions as warranted. (*Id.*)

On or about June 21, 2023, fourteen days after his arrival at Dixon, Plaintiff met with Nurse Practitioner Chelsea Sword. (Carpenter SOF ¶ 21.) Plaintiff told NP Sword that he needed a single-man cell due to the risk of eye injury from fights. (*Id.*) NP Sword informed Plaintiff that she "did not see a medical reason for this to be issued by medical," advised him to speak with mental health staff regarding his request for a single-man cell, and referred him for an evaluation with Dr. Sy as he demanded. (*Id.* ¶ 22; Email exchange [67-5] at 2.) NP Sword forwarded her assessment to Carpenter and Dr. Sy. (Sy SOF ¶ 18.) When Defendant Carpenter learned from NP Sword's email that she had referred Plaintiff to Dr. Sy, she understood that the matter was being handled by the proper clinical chain of command and took no action to interfere with the process. (Carpenter SOF ¶ 23; [67-5] at 2.)

On or around July 18, 2023, Plaintiff saw Dr. Sy to discuss his request for a single-man cell accommodation. (Sy Ex. 1 [79-2] at 9 (indicating the purpose of the 7/18/23 visit was to "discuss single cell per Sword").) During this appointment, Plaintiff did not ask Dr. Sy to perform a new medical assessment for the migraines and light sensitivity that followed from his retinal detachment. (Carpenter SOF ¶ 27.) Defendant Sy noted prior recommendations from Plaintiff's provider at UIC, who suggested a single-man cell for Plaintiff to avoid the risk of eye trauma in a fight. (Sy SOF ¶ 19.) Plaintiff testified that "he [Dr. Sy] initially told me 'I have no problem with this' but let me check with someone." (Pl. Dep. [79-1] at 110:8–9.) In his declaration, however, Defendant Sy states, without elaboration, that he "did not see a medical need for Plaintiff to be housed single celled at this time." (Sy Decl. [79-2] ¶ 14.) Notably, Dr. Sy nevertheless inquired

6

with prison administration[5] about the availability of single cells for social reasons.  The unidentified person[s] he spoke to advised him that another inmate with the same condition as Plaintiff was housed with a cellmate, and that Plaintiff's request for a single-man cell could not be accommodated.  (Sy SOF ¶ 21.)  Plaintiff claims that at this same appointment, he overheard Defendant Carpenter tell Dr. Sy, "[n]o for a single man cell permit for Zirko."  (Carpenter SOF ¶ 24.)  Plaintiff contends that this statement is evidence of Defendant Carpenter's decision not to accommodate Plaintiff's request for a single-cell permit, but he cites no evidence disputing Defendant Carpenter's sworn statement that she has never dictated a clinical decision regarding medical necessity to Dr. Sy for any inmate, including Plaintiff.  (*Id.*  ¶ 25.)

Following the denial of the single-cell accommodation, Dr. Sy has not refused Plaintiff any appointments, and has continued to provide Plaintiff with migraine medication and to refer him to specialists.  (Carpenter SOF ¶ 28.)

Some time around July 2023, Plaintiff was moved to the second floor of Dixon C.C.'s healthcare unit for medical reasons.[6]  (*Id.* ¶ 29.)  Defendant Carpenter facilitated the move.  (*Id.* ¶ 30.)  In an August 10, 2023 letter to Dixon's health care unit. Plaintiff requested to be seen by the prison optometrist for blurry vision, which he claimed he had been experiencing for the past two months.  (Sy SOF ¶ 24.)  Plaintiff saw the prisoner optometrist, Dr. Peter Popovich, on August 16, 2023.  (*Id.* ¶ 25.)  Dr. Popovich examined Plaintiff and attributed his vision issues to myopia, astigmatism, and dry eye syndrome.  (*Id.*)  Dr. Popovich prescribed Plaintiff artificial tears and recommended that Plaintiff wear CrossFire ("CF") protective glasses all the time.  (*Id.*)  He also

---

[5]     Dr. Sy's declaration does not identify whom he spoke with in "prison administration" and his notes from Plaintiff's July 18, 2023, visit are somewhat illegible.  (*See* Dr. Sy. Decl. [79-2] ¶ 15; [79-2] at 9 (referring to either "HCU Administrator" or "HCU Administration").)  Defendant Carpenter's declaration does not directly address whether she spoke with Dr. Sy on July 18, 2023.

[6]     Plaintiff testified that the move to the Health Care Unit was unrelated to his eye condition/migraines; rather, it was due to his age and an inability to walk to the chow hall and to line up for medications quickly enough, while being accompanied by security staff.  His testimony is that the move was on a referral/recommendation by security staff that Plaintiff be placed in the health care unit.  (Pl. Dep. [67-1], at 50:3–51:18.)

recommended tinted and bifocal lenses for the glasses, but Plaintiff refused that recommendation. (*Id.*) Dr. Popovich also referred Plaintiff to an offsite retina specialist for further evaluation. (*Id.*)

On August 18, 2023, Plaintiff filed a grievance regarding the denial of his single-man cell permit at Dixon, naming both Defendants Carpenter and Dr. Sy. (Carpenter SOF ¶ 31.) The response from Counselor Frederick affirmed the policy that institutional permits must be re-ordered at each institution (*id.* ¶ 32), and Grievance Officer Wells concurred, noting that Department Rule 415 directs that "all treatment must be ordered by a licensed practitioner at this facility." (*Id.* ¶ 33.) The Administrative Review Board (ARB) issued a final denial of the grievance on January 16, 2024, finding the "issue was appropriately addressed by the facility Administration." (*Id.* ¶ 34.)

On February 1, 2024, Dr. Sy referred Plaintiff for a return appointment with Dr. Chau at UIC. (Sy SOF ¶ 26; Sy Ex. 11 [79-2] at 33–35.) Dr. Chau found Plaintiff's retina was stable and specifically attributed his complaints of light sensitivity to dry eyes, as opposed to migraines. (Sy Ex. 11 [79-2] at 36.) Dr. Chau made several recommendations, including using warm compresses three times daily, artificial tears and lubricant ophthalmic ointment, two pairs of glasses (one with clear lenses and one with shaded lenses), a neurology referral to further assess his migraines, and a return to the retina clinic in one year. (*Id.*) Dr. Chau also noted that a single cell permit would be "ok" for Plaintiff, specifically due to his eye trauma history. (*Id.*)

With the sole exception of the single-man cell permit, Dr. Sy approved all of Dr. Chau's recommendations. (*Id.* at 33) On April 11, 2024, Defendant Sy saw Plaintiff for an appointment, at which time he discussed Plaintiff's February 1, 2024, appointment with Dr. Chau in further detail. (Sy SOF ¶ 27.) He noted at this time that Plaintiff had been using transition lenses but had only tried treating his migraines with Excedrin. (*Id.*) Defendant Sy wrote Plaintiff a prescription for 20 mg of Propranolol, also known as Inderal, to be taken twice daily (or "BID"), to address his complaints of migraines. (*Id.*) On April 18, 2024, Dr. Popovich ordered Plaintiff new

glasses with transitional lenses following UIC Ophthalmology's recommendations and planned for Plaintiff to follow up with that team as directed. (*Id.* ¶ 28.)

On May 9, 2024, Defendant Sy again saw Plaintiff to follow up on his complaints of migraines. (*Id.* ¶ 29.) Plaintiff reported that he was still having migraines that would last for one to two days, and that his then-current protocol of Inderal was not helping. (*Id.*) Defendant Sy increased Plaintiff's Inderal protocol to 40 mg twice per day and included in Plaintiff's prescription a protocol of 50 mg Imitrex to be taken at the outset of a headache. (*Id.*)

On May 27, 2024, Plaintiff had a medical appointment with NP Kristina Mershon. (*Id.* ¶ 30.) He denied having had any headaches since his last visit and denied needing Imitrex. (*Id.*) NP Mershon further assessed Plaintiff during this appointment, finding him to be in no acute distress and neurologically intact. (*Id.*) She continued his existing course of care and advised him to follow up as needed. (*Id.*)

When Dr. Sy again saw Plaintiff on June 18, 2024, however, Plaintiff acknowledged that he had experienced only two migraines since his last appointment, but told Dr. Sy that he did not feel the medication was making a difference. (*Id.* ¶ 30.) Defendant Sy increased Plaintiff's Propranolol prescription to 80mg two times per day, increased his Imitrex prescription to 100mg, wrote him a referral to UIC neurology for further evaluation, and planned to see him again six weeks later. (*Id.*) At that follow-up appointment on July 30, 2024, Plaintiff advised that he still got headaches two to three times per month, but that Imitrex might be helping. (*Id.*) Based on his examination of Plaintiff, Defendant Sy planned to taper his existing Propranolol prescription while starting him on Topamax and reassess him in six weeks. (*Id.*)

Plaintiff is unaware of any inmates with a retinal detachment injury like his who have a single-man cell permit while he does not. (Sy SOF ¶ 39.) He contends, however, that one inmate at Dixon was placed in a single-man cell because he suffered from Irritable Bowel Syndrome and needed to defecate many times per day. (Carpenter SOF ¶ 39.) Plaintiff contends that other inmates at Dixon were in single-man cells on the second floor of Dixon's healthcare unit, including

9

"Darrian Stevenson and 'Mr. Adams."  Plaintiff has not spoken to these inmates about the issue, has not seen any permits that authorized then for single-man cell placement, and does not know why they were placed in single-man cells.  (*Id*.)

Plaintiff's deposition testimony confirms that he understood from the grievance responses that a licensed practitioner at Dixon C.C. was required to order a single-man cell accommodation. (Carpenter SOF ¶ 35.)  Plaintiff has not been in any physical fights or sustained any blunt force trauma to his eye while housed at Dixon.  (*Id*. ¶ 36.)  Plaintiff's suit against Carpenter is based solely on his belief that she instructed Defendant Sy to refuse his request for a single-cell; he would not have named Carpenter in this lawsuit otherwise.  (*Id*. ¶ 37.)

### ANALYSIS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party bears the burden of establishing that no material facts are in genuine dispute.  *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 160 (1970).  Any doubt as to the existence of a genuine issue is resolved against the moving party. *Id*.

The Eighth Amendment protects prisoners from officials' deliberate indifference to their serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would perceive the need for a doctor's attention."  *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021).  Establishing deliberate indifference "requires a showing of something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

Defendants do not dispute that, prior to and during the relevant time period, Plaintiff suffered from a number of serious medical conditions, including but not limited to retinal detachment and severe migraines.  Both conditions easily meet the standard for an objectively serious medical need.  In his response to this motion, Plaintiff identifies his serious medical

condition in a more nuanced way, pointing to serious risk of harm to his vision. It is well established that, in appropriate circumstances, "the Eighth Amendment protects against future harm." *Helling v. McKinney,* 509 U.S. 25, 33 (1993)*; see also Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016) (an inmate seeking damages for possible future injury must "show 'to a degree of reasonable medical certainty' that he actually faced an increased risk of injury") (quoting *Henderson v. Sheahan*, 196 F.3d 839, 851 (7th Cir. 1999)).[7] Based on the record as it currently stands, the court assumes that the risk of future harm to Plaintiff's eye was objectively serious, as well. The court thus considers Plaintiff's serious medical needs to include his need for retinal care, his need for treatment for his migraines, and his need to avoid possible future injury to his eye.

Plaintiff believes that Defendant Sy's deliberate indifference is evident from the fact that prior to coming to Dixon, Plaintiff had a single-man cell permit at Pontiac. He notes evidence that a specialist at UIC recommended single-man cell placement based on Plaintiff's concern that he might be involved in a future altercation. (Sy SOF ¶ 37.) A defendant's decision to ignore a specialist's orders can raise an inference of deliberate indifference, *see Gil v. Reed*, 381 F.3d 649, 662–64 (7th Cir. 2004). Plaintiff's belief that he is a victim of deliberate indifference is also based on an overheard conversation between Defendant Sy and Defendant Carpenter in which Carpenter stated Plaintiff would not be given a single man cell. (Carpenter SOF ¶ 22.)

Dr. Sy first saw Plaintiff in July of 2023, six weeks after his arrival at Dixon. (Sy SOF ¶ 19.) At that time, Dr. Sy reviewed his medical records, including the Pontiac permit and the recommendation of the UIC specialist, Dr. Chau. (*Id*.) He also reviewed the recommendation of Nurse Practitioner Chelsea Sword, based on her evaluation during a June 2023 examination, that

---

[7]     The prisoner plaintiff in *Helling* was complaining about a danger of future medical harm from exposure to environmental tobacco smoke ("ETS"). The Court noted that a showing of such risk requires evidence of the seriousness of the potential harm, the likelihood that the harm will result, and whether the risk is so grave that it must not be tolerated. *Helling,* 509 U.S. at 33–36. The court is uncertain Plaintiff Zirko can make such a showing, but Defendants have not, at this stage, challenged his claim on this basis.

Plaintiff did not have a medical need for a single-man cell. (Sy SOF ¶ 18.) Dr. Sy also conferred with someone in prison administration (perhaps Defendant Carpenter, though Dr. Sy does not say) who informed him that another inmate with Plaintiff's medical condition was not assigned to a single-man cell. (Sy SOF ¶ 21.)

Defendant Sy was entitled to use his own professional judgment in determining the medically appropriate course of treatment for Plaintiff, and he argues that he did so. *See Zackery v. Mesrobian*, 299 F. App'x. 598, 601 (7th Cir. 2008) ("[A] difference of opinion among physicians is insufficient to establish deliberate indifference."); *Askew v. Davis*, 613 Fed. App'x. 544, 547 (7th Cir. 2015). Presumably, Dr. Sy could explain his reasoning for declining to honor the recommendations of Dr. Alford and Dr. Chau for Plaintiff's placement in a single-man cell as a precaution against possible future trauma to his eye. The evidence shows Dr. Sy did review the medical records that supported those recommendations. (Sy Ex. 3 [79-2] at 21; Sy Ex. 11 [79-2] at 36.) Yet nothing in the record explains the reasons for his conclusion that there was no "medical need for Plaintiff to be housed single celled at this time." (Sy Decl. [79-2] ¶ 14.) Nor does the record include an explanation of Dr. Sy's actual assessment of Plaintiff's risk of future eye trauma; whether Dr. Sy believed the risk had increased or decreased in the ten weeks since Plaintiff first received his single-man cell permit at Pontiac; if there remained a risk of future harm, whether or how that risk was being addressed in other ways at Dixon; or whether Dr. Sy simply disagreed that the risk to Plaintiff was substantial or serious in the first place. Instead, the record suggests that Sy relied in part on statements by other another medical professional (Nurse Practitioner Sword) that no single-man cell permit would be issued to Plaintiff (Sy Ex. 6 [79-2] at 27)—a puzzling reliance, in that Dr. Sy has final authority to make medical necessity determinations, and that Sword's determination that a single-man celling was not medically necessary is also unsupported by any explanation. (*Id.*)

The court is also troubled by indications that non-medical considerations impacted Dr. Sy's determination concerning a single-man cell permit for Plaintiff. The July 18, 2023 medical

12

note states that his decision was made in consultation with (unnamed) prison administrators who determined that another inmate suffering the same condition as Plaintiff was not in a single-man cell. (Sy Ex. 1 [79-2] at 9.) Courts have recognized repeatedly that when detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention. *See Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005). Thus, we do not hold non-medical prison officials liable for deliberate indifference in a case where a prisoner is under a doctor's care. But the reverse cannot also be true; that is, Dr. Sy may have good medical reasons to deny a single-man cell permit for Plaintiff, but the court will not accept an explanation that he did so on the basis of conclusions reached by other staff, including non-medical personnel. The record here does not include Dr. Sy's own medical reasoning for denying Plaintiff's previously prescribed single-man cell permit, while Sy knew of a possible risk of future harm.

In reaching its conclusion here, the court notes that the record is replete with evidence of significant and ongoing care for Plaintiff's medical condition, particularly his migraine headaches. The crux of Plaintiff's claim, however, relates to the possibility of future injury to his eye, and there is no evidence that Dr. Sy considered this when he denied the single-man cell permit. If the permit was denied for administrative rather than medical reasons (Sy Ex. 1 [79-2] at 9), the court is being asked to ignore controlling case law that establishes deference by administrators to medical professionals in the making of medical decisions—not the reverse. *See Burks v. Raemisch,* 555 F.3d 592, 596 (7th Cir. 2009) ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference"); *Greeno,* 414 F.3d at 656 (when inmate is under the care of doctors, "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.") (cleaned up). As there is evidence here that the decision to deny Plaintiff the previously-prescribed single-man cell permit could have been administrative, and the record is silent as to the medical reasons for the denial, material questions of fact remain as to whether Defendant Sy was deliberately indifferent.

13

The evidence in support of Plaintiff's claim against Defendant Carpenter is thin, but also sufficient to survive summary judgment. Carpenter has argued that, as an administrator, she was not personally involved in any treating decisions for Plaintiff. Yet it was Carpenter who saw Plaintiff at intake and immediately advised him the single-man cell permit that a physician had issued would not be honored. There is no evidence that she consulted any medical professional in making this decision. Viewed in the light most favorable to Plaintiff, there is evidence that Defendant Carpenter had a conversation with Dr. Sy in which she told him that Plaintiff would not be granted single-man cell permit. As the parties agree that it was Dr. Sy who possessed final authority over the permit, Carpenter must explain why she exercised that authority, at least until Plaintiff met with Dr. Sy two months later, despite her knowledge that medical providers at other institutions had approved the permit. Defendant Carpenter's motion for summary judgment [66] is also denied.

## **CONCLUSION**

Defendants' motions [66] [71] are denied. This case is set for a status hearing on April 2, 2026 at 10:30 a.m to discuss next steps in this case. The court again encourages the parties to discuss the possibility of settlement, especially in light of the fact that Plaintiff's money damages are likely *de minimis*.

ENTER:

Date: March 11, 2026

_____
REBECCA R. PALLMEYER
United States District Judge

14